**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| Valentina Isakina | : | |
| c/o Anthony Law, LLC | : | Case No.: _____ |
| 978 S. Front Street | : | |
| Columbus, Ohio 43206 | : | Judge _____ |
| | : | |
| Plaintiff, | : | |
| | : | |
| -vs.- | : | **COMPLAINT** |
| | : | |
| ReAlpha Tech Corp. | : | |
| c/o Advantage Delaware LLC, Statutory Agent | : | |
| 3524 Silverside Road, Ste. 35B | : | **JURY DEMAND ENDORSED** |
| Wilmington, Delaware 19810 | : | **HEREON** |
| | : | |
| Serve also at: | : | |
| | : | |
| ReAlpha Tech Corp. | : | |
| 6640 Riverside Drive, Ste. 200 | : | |
| Dublin, Ohio 43017 | : | |
| | : | |
| Defendant. | | |

Now comes Plaintiff Valentina Isakina, by and through the undersigned counsel, and for her Complaint against Defendant ReAlpha Tech Corp. hereby states as follows:

## I. INTRODUCTION & PARTIES

1. Plaintiff Valentina Isakina ("*Plaintiff*") is an individual and resident of the State of Georgia.

2. Defendant ReAlpha Tech Corp. ("*Defendant*" or "*ReAlpha*") is a Delaware corporation with its principal place of business in Franklin County, Ohio.

## II. JURISDICTION AND VENUE

3. This court has original jurisdiction over Plaintiff's claims pursuant to 28 U.S.C.

§ 1332, based on the parties' diversity of citizenship and because the amount in controversy exceeds $75,000.

4. Venue is appropriate in this judicial district pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claim occurred in the Southern District of Ohio, where Defendant ReAlpha has its principal place of business.

### III. FACTS COMMON TO ALL CLAIMS

#### A. *Background*

5. Plaintiff Valentina Isakina is an experienced and renowned executive in corporate strategy, digital transformation, private equity, and fundraising. She previously served as advisor for the office of a former U.K. Prime Minister, as a Fortune 100 executive, as a director on multiple corporate boards, and has consulted with numerous global corporations. She also holds a CFA investment designation, making her a "regulated person" with the U.S. Securities and Exchange Commission.

6. Giri Devanur is the CEO and founder of ReAlpha.

7. Upon later identified information and belief, Mr. Devanur is under criminal investigation and currently out on bail for a real estate-related investor fraud in India on allegations that include stealing about $2,500,000 from American investors. He is charged with: (i) cheating and dishonesty, inducing delivery of property; (ii) forgery for purpose of cheating, and (iii) using as genuine a forged document or electronic record (including forgery of government documents), carrying potential sentences of up to seven years' incarceration. *State of Karnataka, rep. By Cubbon Park Police Station v. Giri Devanur and Others*, Case No. C.C. No 9780/2018.

8. ReAlpha is a real estate startup up organization that allegedly uses its artificial intelligence (AI) "reAlphaBRAIN" model to identify and score investment properties based upon

predicted short-term rental potential and projected long-term value. A copy of ReAlpha's "How It Works" webpage is submitted herewith as Exhibit 1.[1]

9. From there, ReAlpha invites the general public to "[b]uy equity in specific properties just like [they] would buy stock or shares on Robinhood," pairing them with "like-minded investors to form a syndicate," with ReAlpha retaining a 51% stake in each one. *Id*.

10. In addition to soliciting investments in property syndicates, ReAlpha is raising substantial sums at its corporate level. A Columbus Dispatch article regarding ReAlpha's proposed $75,000,000 "mini-IPO" is submitted herewith as Exhibit 2.[2]

11. ReAlpha's "mini-IPO" is taking the form of a Regulation A+ with the SEC, which allows for crowdfunding, the raising of small investments online, and exempts the filer from certain disclosure requirements.

### B. ReAlpha Hired Plaintiff as an Advisor with Promises of Additional Responsibilities and Equity Compensation.

12. In October 2020, Mr. Devanur reached out to Plaintiff to assist him in a startup venture. Eventually, the discussions transitioned to Plaintiff's involvement in another one of Mr. Devanur's projects, ReAlpha.

13. At the time, ReAlpha was in a rough conceptual stage.

14. By January 2021, based upon the initial discussions and initial work by Plaintiff, Mr. Devanur offered Plaintiff various roles in ReAlpha including serving as a cofounder and CFO, a compensated Advisory Board position, and membership on the Board of Directors with extra equity compensation to recognize her material contribution.

15. Due to Plaintiff's existing professional commitments, Plaintiff turned down Mr.

---

[1] https://www.realpha.com/how-it-works
[2] https://www.dispatch.com/story/business/2021/09/30/dublin-firm-realpha-moves-ahead-ambitious-airbnb-plan/5930705001/

Devanur's proposal to grant her 15% of the equity in ReAlpha to serve as cofounder and CFO.

16. Plaintiff, nevertheless, agreed to serve as an Advisor in the interim and to serve on ReAlpha's Board of Directors, with the compensation terms to be finalized and further subject to her onboarding due diligence of the company.

17. As Plaintiff believed ReAlpha's finalization of her Board position to be moving along in good faith, she immediately began to advise the company on strategy, growth, business model development, providing day-to-day tactical advice, recruiting, financial analysis and modeling, proprietary intellectual property development (ReAlpha Score), marketing, and soliciting investment.

18. In January 2021, the parties executed a Founder Advisor Agreement (the "**FA Agreement**") as a placeholder, which provided for three hours of services per month (the "**FA Baseline Services**") in return for a 1%, fully diluted common stock that would vest upon "closing of the sale of the Company or a liquidity event, whichever comes earlier." A copy of FA Agreement is attached as Exhibit 3.

19. At the time, Plaintiff was providing extensive working support and services well beyond three hours per month, well beyond the scope of a typical Director, and more in line with a nonexecutive cofounder.

20. As such, the parties agreed that ReAlpha would provide additional compensation for services beyond the limited scope of the FA Agreement (the "***Additional Services***").

21. Initially, the agreement was that these Additional Services would be paid at Plaintiff's standard market rate. Mr. Devanur, however, later requested and Plaintiff agreed that in lieu of future payments Plaintiff would receive additional equity, the terms of which would be negotiated in good faith, as part of the Board appointment and compensation package that was

being discussed simultaneously.

22. On or around January 29, 2021, while Plaintiff was still performing her corporate due diligence prior to formal acceptance, ReAlpha announced to the public that Plaintiff had accepted a Director position and began marketing itself accordingly.

23. Still believing discussions to be moving ahead in good faith, Plaintiff continued to provide extensive support to ReAlpha, including recruiting ReAlpha's first full-time employee, a CFO who was previously an executive for a global financial corporation.

24. During this period, ReAlpha marketed itself and solicited investments with Plaintiff listed as a Director on its pitch deck, and her personal involvement was indispensable to securing a pre-seed investment (a "liquidity event" per the FA Agreement).

25. Based in part on Plaintiff's work, Mr. Devanur estimated ReAlpha's full potential value to be over $1,000,000,000.

### C. *Plaintiff Discovered Shoddy Corporate Governance with ReAlpha; Mr. Devanur Terminated Her in Retaliation.*

26. By March 2021, Plaintiff had uncovered some concerning issues in her due diligence of ReAlpha.

27. ReAlpha had no directors & officers insurance policy to shield them from potential liability. ReAlpha's corporate documents were inconsistent. It had loose corporate bylaws, had conducted no Board meetings, had no meeting minutes, and had multiple conflicting capitalization tables. In addition, ReAlpha had no documentation that it had even authorized the shares issued by Mr. Devanur thus far, potentially invalidating all advisor and investor agreements to that date.

28. Mr. Devanur was running ReAlpha as if he were a sole proprietor.

29. As Plaintiff expressed these concerns, Mr. Devanur tried to speed up her acceptance of his Board appointment proposal and urged her to accelerate ReAlpha's fundraising efforts.

30. On March 28, 2021, Plaintiff sent Mr. Devanur the final draft of the Board appointment letter, incorporating several essential corporate governance recommendations and proposing additional equity per the parties' discussions. The correspondence also indicated that ReAlpha would need to stop soliciting investments until it addressed the governance issues, and that existing investors needed to be made aware of them as well. Plaintiff further proposed to take the Chair of the Board role so that she could assist the Company in these matters more directly.

31. Mr. Devanur dismissed the proposal, unilaterally retracted the offer to join the Board, and refused to address any additional equity compensation for Plaintiff.

32. By April 6, 2021, Plaintiff raised her concerns to a ReAlpha Director-investor, who admitted that no Board meetings had taken place to date. The Director agreed to address these corporate governance and investor protection issues and said they needed her on the Board because of her corporate governance skills, among others. Plaintiff and the Director agreed that ReAlpha would hire a legal team to conduct a governance clean up and that Plaintiff would wait to hear on the resolution before continuing her fundraising efforts.

33. On April 20, 2021, not having heard back on the next corporate governance steps, Plaintiff contacted Mr. Devanur and attempted to resolve compensation uncertainties.

34. On April 23, 2021, Mr. Devanur, unilaterally and in retaliation of Plaintiff's actions on governance issues, terminated Plaintiff's FA Agreement.

D. *ReAlpha Refuses to Recognize Plaintiff as a Shareholder.*

35. Within about a month after ReAlpha terminated Plaintiff, it raised several million dollars from investors (another "liquidity event"), in part due to Plaintiff's contribution to ReAlpha.

36. Additionally, and as stated above, ReAlpha is seeking to raise up to an additional

$75,000,000 per a Regulation A+ investor offering.

37. Plaintiff estimates ReAlpha's current value to be above $30,000,000.

38. To date, ReAlpha does not recognize Plaintiff as a shareholder, not even for the 1% fully diluted common stock interest which vested upon the occurrence of a "liquidity event."

## IV. CAUSES OF ACTION

### Count One – Declaratory Action

39. Plaintiff restates the allegations set forth in the preceding Paragraphs as if fully rewritten herein.

40. A controversy has arisen concerning the existence, provisions, meaning, and interpretation of the FA Agreement, including whether or not Plaintiff's 1% fully diluted common stock interest had vested.

41. A declaration of the existence, provisions, meaning, and interpretation of the FA Agreement is necessary to resolve this controversy.

### Count Two – Breach of Contract

42. Plaintiff restates the allegations set forth in the preceding Paragraphs as if fully rewritten herein.

43. Plaintiff and Defendant entered into the FA Agreement.

44. Plaintiff has performed and/or exceeded the performance according to the terms of the FA Agreement.

45. Defendant breached the FA Agreement in ways including, but not limited to, not granting Plaintiff her 1% fully diluted common stock interest in ReAlpha.

46. In addition to her other rights and remedies as a result of Defendant's breach, Plaintiff seeks the remedy of specific performance of her right to the 1% fully diluted common

stock interest in ReAlpha. The shares are unique and monetary damages are unavailable and/or incalculable.

### Count Three – Breach of Contract

47. Plaintiff restates the allegations set forth in the preceding Paragraphs as if fully rewritten herein.

48. Plaintiff and Defendant agreed that Plaintiff would be entitled to additional equity compensation in ReAlpha for the Additional Services and for her serving on the Board of Directors.

49. Plaintiff performed in accordance with the terms of the agreement by providing services well beyond those contemplated by the FA Agreement, in anticipation of joining the Board.

50. Defendant breached the terms of the agreement by retaliating against Plaintiff for raising investor concerns and not offering any extra shares in ReAlpha as agreed based upon the value of the contribution by Plaintiff.

51. As a result of Defendant's breach, Plaintiff has been damaged in an amount exceeding $75,000.

### Count Four – Promissory Estoppel

52. Plaintiff restates the allegations set forth in the preceding Paragraphs as if fully rewritten herein.

53. Defendant made clear and unambiguous promises to issue additional compensation to Plaintiff in return for Plaintiff's services performed beyond the scope of the FA Agreement.

54. Plaintiff relied upon Defendant's promises to her detriment.

55. Plaintiff's reliance on Defendant's promises was both reasonable and foreseeable.

56. Plaintiff is entitled to restitution for actions taken as a proximate result of her reliance on Defendant's promises.

### Count Five – Unjust Enrichment

57. Plaintiff restates the allegations set forth in the preceding Paragraphs as if fully rewritten herein.

58. Plaintiff conferred a benefit upon Defendant, with Defendant's knowledge, in ways including, but not limited to, performing services beyond the scope of the FA Agreement.

59. Defendant knew that Plaintiff performed those services with the expectation of payment of reasonable value.

60. Defendant had reasonable opportunity to prevent Plaintiff from performing the services.

61. It would be unjust to allow Defendant to retain the benefit conferred by Plaintiff without compensation of reasonable value.

**V.     PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff respectfully requests the following relief:

A. A declaration of the existence, provisions, meaning, and interpretation of the FA Agreement;

B. Specific performance awarding Plaintiff the fully diluted common stock interest in ReAlpha to which she is entitled;

C. In the alternative, monetary damages in an amount to be determined at trial, but in any event in excess of $75,000; and

D. Awards of punitive damages, attorney fees and costs, prejudgment interest, and such other relief as the Court deems equitable and just.

        Respectfully submitted,

/s/ Vincent P. Zuccaro
Michael J. Anthony (0066447)
Vincent P. Zuccaro (0085484)
ANTHONY LAW, LLC
978 S. Front Street
Columbus, Ohio 43206
(614) 340-0011
(614) 675-9978 FAX
mja@anthonylawllc.com
vpz@anthonylawllc.com
*Attorneys for Plaintiff*

## JURY DEMAND

Plaintiff demands a jury of no fewer than eight jurors on all triable issues of fact.

/s/ Vincent P. Zuccaro
Vincent P. Zuccaro (0085484)